Royal after the salon lost Matrix, the growth of Matrix after the loss, and the number of requests made for Matrix in the salon according to Ebeido's and Johnson's testimony.

The calculation of average number of sales per day provides no basis to determine the average number of potential Matrix sales per day. Even if the average number of potential Matrix sales per day was calculable, only the last of suggested methods to calculate damages (the customer requests for Matrix products) provides a causal link between possible Matrix sales and the loss to the salon. However, this method of calculating lost sales in an antitrust case was rejected as speculative and unreliable in *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1496-1497 (8th Cir. 1992). The *Amerinet* court held that identification of potential buyers is not sufficient evidence of lost sales unless it is accompanied by additional proof that the sales would have actually occurred. *Id*.

Ezzo's failed to present evidence sufficient to find that the concerted action alleged was a material cause of injury to its business, that its business had in fact suffered an injury, and if so, the causal connection between that injury and the alleged conspiracy. Failure of an antitrust plaintiff to meet its burden in any of these areas is grounds for entry of a judgment as a matter of law. Therefore, the district court's ruling was proper.

AFFIRMED.

---

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0075P (6th Cir.)
File Name: 01a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

EZZO'S INVESTMENTS, INC.,
      *Plaintiff-Appellant,*

      *v.*

ROYAL BEAUTY SUPPLY, INC.;
ALVIN JACOBS; RAYMOND
JACOBS; JOHN FAIL; ALAN
SNETMAN,

      *Defendants,*

MATRIX ESSENTIALS, INC.,
      *Defendant-Appellee.*

No. 99-5246

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 93-00690—Thomas A. Wiseman, Jr., District Judge.

Argued: September 14, 2000

Decided and Filed: March 22, 2001

Before: JONES, SILER, and CLAY, Circuit Judges.

---

### COUNSEL

---

**ARGUED:** Larry L. Crain, LAW OFFICE OF LARRY L. CRAIN, Brentwood, Tennessee, for Appellant. John D. Parker, BAKER & HOSTETLER, Cleveland, Ohio, for Appellee. **ON BRIEF:** Larry L. Crain, LAW OFFICE OF LARRY L. CRAIN, Brentwood, Tennessee, Clinton W. Watkins, Brentwood, Tennessee, for Appellant. John D. Parker, Marcia E. Marsteller, BAKER & HOSTETLER, Cleveland, Ohio, for Appellee.

---

### OPINION

---

SILER, Circuit Judge. Plaintiff Ezzo's Investments, Inc. ("Ezzo's") and its owner Ezzo Ebeido ("Ebeido") sued Matrix Essentials, Inc. ("Matrix"), and other defendants not parties to this appeal, alleging a conspiracy to fix prices of beauty products in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1[1] ("the Act"), Section 2 of the Clayton Act (as amended by the Robinson-Patman Price Discrimination Act), 15 U.S.C. § 13, Section 3 of the Clayton Act, 15 U.S.C. § 14, and Tennessee Code Section 47-25-101. Ezzo's Clayton and Robinson-Patman Act claims were dismissed by the district court for failure to state a claim. The state law claims were withdrawn, leaving only  claims under the Sherman Act against Matrix.

---

[1]Section 1 of the Sherman Act provides that:

> [e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal.

15 U.S.C. § 1.

Ezzo's accounting expert admitted that several factors and actual occurrences could have caused any economic loss the salon suffered after the loss of the Matrix line. Ezzo's expert also admitted that when he attempted to calculate damages in this case, he did not take any of these factors or occurrences into account. The failure of Ezzo's to exclude other possible causes of damages precludes a finding that the alleged antitrust violation was the material cause of Ezzo's losses under *Shreve Equipment*.

Finally, Ezzo's model for calculating damages did not adequately allow the jury to assess damages. In *Elder-Beerman*, we held:

> [w]e recognize that the Supreme Court has pointed out on more than one occasion that although proof of the amount of damage in a case such as this may be somewhat uncertain, plaintiff is not precluded from recovery unless the amount of damage is totally speculative.
>
> * * *
>
> "In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly."

*Id.* at 150 (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)).

At trial, Ezzo's expert witness described the calculations and models by which the jury could calculate the salon's damage due to the loss of Matrix. Ezzo's admits in its brief that the expert's calculation "does not reflect the number of lost [Matrix] sales." Ezzo's argues that the calculations of average sales per day could be used to calculate the number of Matrix sales lost by examining the salon's growth during the period it sold Matrix, the increase in Matrix sales by

In *Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 148 (6th Cir. 1972), the court held that for an antitrust plaintiff, "an essential element in attempting to establish the fact of damage because of exclusion from a specified source of supply is the lack of an alternative comparable substitute for the desired merchandise." The court also held that expressions of desire failed to prove that excluded merchandise was unique. *Id*. at 149. Ezzo's did not offer evidence at trial to show a lack of comparable substitute brands. Ezzo's now argues that because Matrix described products as "prescriptive" and Royal officials described them as "unique," its burden to prove a lack of a comparable substitute brand under *Elder-Beerman* is alleviated.

The testimony of Matrix and Royal officials in which they describe Matrix products is insufficient evidence to satisfy the burden to show lack of substitute brands in *Elder-Beerman*. At oral argument, both parties agreed that the products in question were "just shampoo."

Matrix contends that Ezzo's ability to carry five times as many product lines since the loss of its products and Ebeido's own testimony about satisfaction with the new lines support a finding that alternative brands were available. Matrix also contends that Ezzo's substantial increase in sales after the loss of its line is evidence that no injury was suffered. The district court ruled that the substantial increase in Ezzo's sales precluded a showing that the salon had been damaged by the alleged conspiracy.

The district court properly relied upon the evidence that showed Ezzo's substantial increase in sales in granting the motion. The failure of Ezzo's to show a lack of substitute brands provides an additional reason to affirm the district court's ruling.

Ezzo's failed to offer any evidence at trial that attributed the damages the salon suffered to the alleged antitrust violation instead of other market factors. At trial, Ebeido and

The district court granted Matrix's motion for partial summary judgment, holding that Ezzo's had not offered the requisite proof under a rule of reason analysis to show that a policy restriction on the distribution of Matrix products ("50% rule," "the rule," or "the policy") was an unjustified and unreasonable vertical suppression upon competition, or illegal *per se* under the Act. At trial, after Ezzo's case-in-chief, the district court granted Matrix's Rule 50 motion for judgment as a matter of law on Ezzo's claim that Matrix and Royal Beauty Supply ("Royal"), Matrix's Nashville area distributor, had conspired to fix prices in violation of the Act. The district court also held that Matrix was entitled to judgment as a matter of law on Ezzo's claim that the 50% rule was a pretext for price-fixing and had been selectively enforced to eliminate discounters of Matrix products in violation of the Act. We **AFFIRM**.

## I. BACKGROUND

The facts of this case are stated in a light most favorable to Ezzo's because this appeal arises from the entry of a partial summary judgment and judgment as a matter of law dismissing the case.

Ebeido owns a beauty salon in Nashville, Tennessee through Ezzo's Investments, Inc. Ebeido is the sole provider of hair care at the salon. The majority of gross sales at the salon are derived from the sale of beauty products.

In October 1989, John Fail and Raymond Jacobs, employees of Royal, visited the salon and inquired as to whether Ebeido would be interested in purchasing Matrix products for resale. At the time, Matrix sold "professional salon" products through its "professional salons policy." The relevant portion of the policy for this case is a contractual restriction between Matrix and its distributors allowing sales of Matrix products only to salons that derive more than 50% of their revenue from hair-care services rather than product

sales. This policy has been labeled the "50% rule" in this litigation.

Ebeido has never contended that his salon met the requirement of the 50% rule at any time relevant to this case. He maintains that when Fail and Jacobs discussed the signing of a "Success Club" agreement with Royal, he refused to do so because he did not want to be restricted by the 50% rule. Ebeido also contends that Fail and Jacobs waived the 50% rule during their pitch of Matrix sales in his salon. Fail and Jacobs maintain that Ebeido agreed to add styling chairs to his salon in order to increase service revenues to reach compliance with the 50% rule. Ebeido denies this agreement was reached. Nonetheless, Ebeido purchased Matrix products from Royal and resold them from October 1989 through March 1990.

In March 1990, a customer of Ezzo's, Mary Hausman, told Ebeido that the wife of Alan Snetman, another Nashville salon owner and eventual defendant in this case, had informed her that Ezzo's "is just a wholesale place, and we're going to make sure he will not carry products, because he's cutting our prices."

Sometime thereafter, Jill Bauer, regional sales manager of Matrix, told Jacobs that she had received complaints from other Nashville salons about Ezzo's being able to carry Matrix products while in violation of the 50% rule. She also told Jacobs that Ezzo's discounting of Matrix products was "adding fuel to the fire." On March 26, 1990, after the Bauer-Jacobs discussion, Fail and Jacobs met with Ebeido in Nashville for lunch. At this meeting, Ebeido contends that Fail told him that he would lose his right to buy Matrix products from Royal unless he began selling them at suggested retail price.

On March 27, 1990, Bauer phoned Ebeido and requested that they meet. Ebeido responded by saying, "I am not going to raise up prices on Matrix products, if that's what you want

lunch meeting. This dispute of fact arguably[5] creates an issue for the jury's consideration. Nonetheless, even if the issue of whether Ebeido was asked to fix prices is ripe for jury consideration, Ezzo's failure to present evidence which could lead to a reasonable verdict for Ezzo's on the issues of causation and damage provides an independent basis to affirm the district court's grant of Matrix's motion for judgment as a matter of law.

An antitrust plaintiff has the burden to show that the alleged "violation be a material cause of the injury, or that the violation be a substantial factor in the occurrence of damage, or that the violation be the proximate cause of the damage." *Shreve Equip., Inc. v. Clay Equip. Corp.*, 650 F.2d 101, 105 (6th Cir. 1981) (citations omitted). In addition,

[a]lthough a plaintiff need not show that the defendant's wrongful actions were the sole proximate cause of his injuries, the causal link must be proved as a matter of fact and with a fair degree of certainty. To be one of several causes is not enough. The evidence linking the violation to the injury must be more precise than that needed to establish the amount of damages.

*Id.* (citations omitted).

The evidence presented by Ezzo's at trial to establish a causal connection between the alleged conspiracy to fix prices and its loss of business was insufficient as a matter of law. Ezzo's argues that the trial testimony of Ebeido and Patricia Johnson about customer requests for Matrix products after the salon's loss of the line is sufficient to link the antitrust violation to its loss of business.

---

[5]Of course, Matrix argues that Ezzo's testimony is self-serving and lacks the independence valued and perhaps relied upon by this court in its previous reversal.

practice was "adding fuel to the fire." *Ezzo's Invs., Inc.*, 94 F.3d at 1035-36.

During Ezzo's case-in-chief only Ebeido's testimony and the Jacobs/Bauer conversation were presented as evidence. In its earlier decision, this court placed great weight on the Clark affidavit, stating that it "provides solid, independent evidence that the Defendants had previously pressured salons to sell at suggested retail price." *Id*. at 1035. This court also noted that, in light of the fact that defendants had previously reacted to discounting by asking Clark to raise prices, the Jacobs-Bauer conversation could create a reasonable inference that concerns about Ezzo's discounting were met with a similar decision by Matrix and Royal to encourage Ezzo's to raise prices. *Id*.

The Jacobs-Bauer conversation should not be viewed as creating the same inference on this appeal because the Clark evidence was not presented by Ezzo's at trial. Faced with similar evidence in *Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1030 (6th Cir. 1991), we held, "it is not illegal to terminate a sales relationship 'to avoid losing business of disgruntled dealers,' and '[a] manufacturer is not prohibited from avoiding the potential loss of many of its dealers because it acted in response to price complaints.'" *Id*. (quoting *Garment Dist., Inc. v. Belk Stores Servs., Inc.*, 799 F.2d 905, 909 (4th Cir. 1986), in turn citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)) (citations omitted).

So what this court is left to decide is whether Ebeido's testimony concerning Fail's request to raise prices could result in a reasonable jury verdict for Ezzo's on the issue of whether Matrix and Royal conspired as alleged. Jacobs testified that Fail did not ask Ebeido to raise prices at the

to talk about." Bauer made no response concerning Ezzo's prices and the call ended.

On March 28, 1990, Ebeido received a letter from Jacobs that expressed appreciation for Ezzo's business with Royal and followed up the discussions of the lunch meeting. In the letter, Jacobs described the discussion as a "small discrepancy" over "price structure" and recounted marketing strategies by which Ebeido could display his products with the suggested retail price and then discount them to the price he desired in order to "satisfy all parties involved." Ebeido objected to the method of pricing suggested by the letter, and opted for Matrix products openly displayed with the discounted price.

In an appeal of a previous summary judgment in this case, we recognized that the letter was not a request by Jacobs to Ebeido to fix prices at the suggested retail price. *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032, 1034 (6th Cir. 1996). The letter was thus in conflict with Ebeido's claim that he was asked in the meeting to fix prices. *Id*.

After receipt of the letter Ebeido made four additional purchases of Matrix products from Royal, the last one on May 1, 1990. After that date Royal refused to sell Matrix products to Ezzo's on the basis that it failed to comply with the 50% rule. Thereafter, Royal terminated Ezzo's account.

Ezzo's filed suit against Matrix, Royal, three current or former employees of Royal, and Nashville salon owner Alan Snetman in 1993. Defendants filed a motion for summary judgment on the Sherman Act §1 claim. This motion was granted and Ezzo's appealed. This court reversed the district court's summary judgment in *Ezzo's Invs., Inc.*, 94 F.3d at 1036, holding that the evidence in the case was sufficient to create a reasonable inference for the fact-finder that Royal and Matrix conspired to fix prices and that Matrix's 50% rule was a pretext for price fixing, selectively enforced to discriminate against discounters.

On remand, Ezzo's slightly altered or perhaps even added to its theory of recovery in its proposed "Final Revised Pretrial Order," which stated:

> [i]f the trier of fact should determine that plaintiffs' account was in fact terminated as a result of noncompliance with the "50% rule" and that such rule was not used as a pretext [for price fixing], it is plaintiff's [*sic*] position that the contract between Matrix and Royal Beauty Supply to "enforce" the "50% rule," a subpart of Matrix's "professional salon policy," is an unreasonable vertical restraint that unlawfully and without reasonable justification suppresses competition.

Matrix moved for partial summary judgment on Ezzo's claim that the 50% rule was illegal *per se* in violation of the Act and on Ebeido's individual claims. The district court granted the motion, thereby dismissing both claims, but leaving Ezzo's price-fixing and selective enforcement claims for trial. On the same day, the district court granted Ezzo's motion to voluntarily dismiss Snetman. The next day, the district court entered an order dismissing Royal and the Royal employees due to a settlement between them and Ezzo's, leaving Matrix as the only defendant at trial.

In 1999, the case went to trial on Ezzo's price-fixing and selective enforcement claims. After Ezzo's four-day case-in-chief, Matrix moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court granted Matrix's motion, holding that even though conflicting testimony about whether Matrix and Royal had entered into a conspiracy to fix prices and selective enforcement of the 50% rule created questions for the fact-finder, those determinations were unnecessary because Ezzo's had not offered any evidence of causation of damages or offered a rational basis upon which any computation of damages could be made.

Ezzo's failure to demonstrate that the 50% rule is illegal *per se* or to show that the rule is an unreasonable restraint on trade made summary judgment on this claim appropriate.[4]

## C.  JUDGMENT AS A MATTER OF LAW

Ezzo's failed to present evidence at trial that could have led to a reasonable jury finding that the alleged price-fixing conspiracy between Matrix and Royal resulted in any damage to the salon's business, what amount of damage might have been suffered, or a causal connection between the alleged price-fixing and damages. Failure to provide evidence in any one of these three areas is a sufficient basis to uphold the district court's entry of judgment as a matter of law in favor of Matrix.

Ezzo's presented substantially less evidence at trial to support its claims that Matrix and Royal conspired to fix prices and to selectively enforce the 50% rule against discounters than was before this court when it reversed summary judgment in this case. This court reversed on the basis that the evidence presented on the motion created a reasonable inference of the existence of a conspiracy and selective enforcement. The reversal was predicated on four items of evidence: (1) an affidavit that included information that another Nashville salon was concerned about Ezzo's discounting; (2) an affidavit from a Nashville salon owner, Susan Clark, that indicated that Royal and Matrix had forced her to raise prices in the past; (3) Ebeido's testimony that he was asked to raise prices by John Fail, a Royal employee, at his lunch meeting with Fail and Jacobs; and (4) Raymond Jacobs's affidavit that described a conversation between him and Jill Bauer, a Matrix representative, in which they discussed Ezzo's discounting and Bauer stated that the

---

[4]On appeal, Matrix also argues that Ezzo's *per se* violation theory of recovery is barred by the statute of limitations. Since the district court's summary judgment was proper and dispositive, this argument is not considered.

50% rule's effect on price and interbrand competition are founded on this incorrect assumption.

The district court also properly based its ruling on the fact that Ezzo's did not present evidence that excluded "'the possibility that [Matrix] acted independently,' in developing its marketing strategy," as required under *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). In *Matsushita* the Court held that an antitrust plaintiff facing a motion for summary judgment must show concerted action with regard to restraints challenged under the Act. *Id*. at 588. Ezzo's attack on the 50% rule as illegal *per se* only addresses this issue with regard to whether the rule was applied pretextually or selectively to fix prices pursuant to a conspiracy between Matrix and Royal. Again, that evidence is beyond the scope of Matrix's motion and the district court's ruling, and is not considered for purposes of this portion of the appeal. The lack of other evidence showing that Matrix instituted this policy as a result of a conspiracy to fix prices justifies entry of the partial summary judgment.

Finally, it is interesting to note that the district court's memorandum opinion discussed a similar attack on the validity of Matrix's salon-only policy in *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587 (5th Cir. 1993). Although the 50% rule was not directly in issue in that case, Matrix's salon-only sales policy, the larger policy in which the 50% rule defines the term "salon," was held valid because the rule existed long before the alleged trade restraining conspiracy involved in the case. *Id*. at 594. Of course, the 50% rule also predates contact between Ezzo's and Matrix.

## II. DISCUSSION

### A. STANDARD OF REVIEW

This court applies a *de novo* standard when reviewing a district court's grant of summary judgment. *See Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir.1999). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The reviewing court must consider whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When reviewing whether the nonmoving party has met this burden, we must construe the evidence and draw all inferences in a light most favorable to the nonmoving party. *See Anderson*, 477 U.S. at 254-55.

This court reviews *de novo* a district court's decision to grant judgment as a matter of law. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999). A district court may grant a motion for judgment as a matter of law "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). "Without weighing the evidence or assessing the credibility of the witnesses, and after drawing all reasonable inferences in favor of plaintiff, [an appeals court] must determine whether the record contains evidence sufficient to have allowed jurors to find in favor of plaintiff." *Monday v. Oullette*, 118 F.3d 1099, 1101-02 (6th Cir.1997). "In ruling on a Rule 50 motion, a trial court is not permitted to 'weigh the evidence or make credibility determinations, as these are jury functions.'" *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d. 683, 696 (6th Cir. 2000) (quoting *Jackson v. Quanex Corp.*, 191 F.3d at 657).

### B.  SUMMARY JUDGMENT

Applicability of the Rule of Reason.

The district court properly examined the 50% rule under a rule of reason analysis because it is a vertical non price restraint without an agreement on price or price levels. Ezzo's failed to offer evidence that could show that the 50% rule had an effect on interbrand competition.  The essence of Ezzo's argument before the district court and on appeal is that the 50% rule is a *per se* violation of § 1 of the Sherman Act because it throttles output and discourages or prevents price competition.  Ezzo's also argues that Matrix arbitrarily and selectively enforces its 50% rule against Matrix discounters. The latter argument is beyond the scope of the issue[2] before the district court on the partial summary judgment motion.

The alleged restraint in this case, the 50% rule,  provides that:

> Matrix retail products are sold to professional salons with the sole intent that the salons resell such products only to their clients.  These retail sales are based upon the professionals' knowledge of their clients' hair and beauty needs, as well as an appreciation of each client's particular skin condition and requirements.  It is understood that a professional salon is a salon whose greater percentage of gross sales comes from cosmetology services, not the sale of products.

---

[2] As discussed above, Ezzo's changed or added to its theories of recovery under Section 1 of the Sherman Act prior to trial — claiming the 50% rule was a *per se* violation of the Act.  Matrix explicitly limited its motion for summary judgment to this new theory, and the district court explicitly limited its ruling  to this new theory. The issues of selective enforcement and whether the policy was a pretext for price-fixing were allowed to go to trial and are not considered on the appeal of the partial summary judgment.

The district court's analysis of the 50% rule balanced "(1) whether Matrix had substantial market power to unreasonably restrain trade in the relevant market; (2) whether the restraint actually restricts competition; and (3) whether Matrix has any legitimate justifications for imposing the restrictions" in making its decision.

Ezzo's did not present evidence to establish Matrix's market power within the relevant market.  Ezzo's has merely alleged that Matrix was the biggest company in the industry. As the district court noted, "they [Ezzo's] assume[d] that because the *per se* rule should apply, evidence of market power [was] irrelevant."  In *Davis-Watkins Co. v. Service Merc.*, 686 F.2d 1190 (6th Cir. 1982), a similar rule of reason case involving a vertical intrabrand restraint, the court held that "[w]ithout market power, a firm cannot have an adverse effect on competition."  *Id.* at 1202.  Ezzo's did not offer evidence of Matrix's market power.  Ezzo's also virtually ignores the issue of market power on appeal, instead arguing that the 50% rule is illegal *per se*.

Ezzo's also failed to offer evidence that could prove that the 50% rule had an adverse effect on interbrand competition as required by *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 810 (6th Cir.1988).  Ezzo's merely contends that the 50% rule limits aggressive merchandising of all retail goods by Matrix resellers who wish to comply with the 50% rule. Ezzo's argues this point by first stating that the 50% rule is a volume restriction, and then by attempting to show how such a restriction is a *de facto* price control.  The premise of this argument, that the 50% rule is a volume restriction, is incorrect.[3]  All of Ezzo's conclusions about the

---

[3] As stated above, the 50% rule is neutral with regard to volume because any retailer subject to the policy can sell whatever volume of products desired by adjusting the volume or price of sales or services furnished in the salon to achieve the balance of sales and services required by the rule.

highly plausible claim that its real motivation was to terminate a price cutter.

\* \* \*

Manufacturers are often motivated by a legitimate desire to have dealers provide services, combined with the reality that price cutting is frequently made possible by "free riding" on the services provided by other dealers.

*Business Electronics*, 485 U.S. at 727-728, 731.

In criticizing Matrix's justification for the 50% rule, Ezzo's argues that the rule is a pretext for a price-fixing motive and that the rule is selectively enforced or unenforced. Again, these arguments go beyond the scope of the partial summary judgment sought and granted in this case and are not considered.

The district court relied heavily upon *Business Electronics* in analyzing the 50% rule under a rule of reason. Under *Business Electronics*, evidence of an agreement on price or price levels is necessary to have a vertical restraint held illegal *per se*. Ezzo's failed to present evidence of a price agreement within this vertical restraint. Ezzo's also failed to present evidence that could support a finding that the 50% rule had an effect on interbrand competition. Thus, it was proper for the district court to apply the rule of reason to Ezzo's claims.

### Rule of Reason Analysis.

The district court's grant of partial summary judgment under the rule of reason can be affirmed on three bases: (1) Ezzo's failure to present evidence that could have established that Matrix had sufficient market power to affect competition within the relevant market, (2) Ezzo's failure to show that the 50% rule had an effect on interbrand competition, or (3) Ezzo's failure to provide evidence that excluded the possibility that the 50% rule was not formed independently.

Ezzo's concedes that this policy between Matrix and its distributors is a vertical restraint. The 50% rule does not have a pricing element. Nonetheless, Ezzo's argues that scrutiny of the 50% rule, which it contends was absent during the district court's summary proceedings, will show that its true purpose is to limit output and prices.

When concerted action is challenged as an unlawful restraint on trade under Section 1 of the Act, courts will normally examine the claim by applying the rule of reason. *See Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988). Under the rule of reason "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 (1977)) (citations omitted). "Under . . . the 'rule of reason,' it is necessary to 'evaluate [the restriction] by analyzing the facts peculiar to the business, the history of the restraint, and the reasons it was imposed . . . to form a judgment about the competitive significance of the restraint.'" *Lie v. St. Joseph Hosp. of Mount Clemens*, 964 F.2d 567, 569 (6th Cir. 1992) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).

In analyzing agreements that are not *per se* violations of the antitrust laws, the court is looking to whether the action complained of has the potential for genuine adverse effects on competition, and this analysis usually involves an inquiry into market definition and market power.

*Id.* (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986)) (quotation marks omitted).

Conduct that is "manifestly anticompetitive" is illegal *per se* under the Act and is not examined on a case-by-case basis. *Id.* (quoting *GTE Sylvania*, 433 U.S. at 50). Conduct that is illegal *per se* under the Act involves practices or agreements

"that would always or almost always tend to restrict competition and decrease output." *Id*. (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289-290 (1985), in turn quoting *Broadcast Music Inc. v. Columbia Broad. Sys., Inc.* 441 U.S. 1, 19-20, (1979)).

Trade restraining agreements scrutinized under the Act can be categorized as horizontal — "agreements between competitors at the same level of market structure," or vertical — "combinations of persons at different levels of the market structure, such as manufacturers and distributors." *Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991) (quoting *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied*, 439 U.S. 946 (1978), as quoted in *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805-06 (6th Cir.1988)). Vertical restraints primarily affect intrabrand competition, while horizontal restraints primarily affect interbrand competition.

Vertical restraints on trade are examined under a rule of reason analysis unless they include "some agreement on price or price levels." *Business Electronics Corp.*, 485 U.S. 717, 735 (1988). The rationale for different treatment of vertical restraints is that "as long as interbrand brand competition existed, that would provide a 'significant check' on any attempt to exploit intrabrand market power," because interbrand competition is "the primary concern of antitrust law." *Id*. at 724, 725 (quoting *GTE Sylvania Inc.* at 52, n. 19).

Consistent with this rationale is the requirement that a plaintiff seeking redress under the Act must show that the complained-of restraint of trade had an effect on competition at the interbrand level. *See Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 810 (6th Cir.1988).

Ezzo's argues that the 50% rule is a throttle on output and interbrand competition because it "restricts and suppresses

aggressive merchandising, including discounting and has the intended effect of coercing adherence to Matrix's suggested retail pricing structure." This argument characterizes the 50% rule as a limit on sales, but the policy is neutral. Any salon that has the ability to purchase Matrix products through conformity with the 50% rule may increase or decrease sales or service volume by making either increases or decreases in volume of sales or services or increases or decreases in the price of sales or services and conform to the rule. Ezzo's makes conclusory statements about the negative effect of the 50% rule on interbrand competition or its hidden design to fix prices at the suggested retail level, but it presents no evidence which could support a finding consistent with these claims.

Ezzo's also contends that the district court's ruling should be overturned because it failed to scrutinize the justification given by Matrix for the policy. Matrix's stated justification for the rule is a desire that Matrix products be sold with high levels of accompanying service. A manufacturer's desire to insure high levels of service accompanying the sale of its products at the retail level was the example the Court used in *Business Electronics* to illustrate why vertical agreements are not illegal *per se* unless they include an agreement on price. In explaining why holding vertical non price agreements illegal *per se* would discourage competitively useful conduct, the court stated:

[a]ny agreement between a manufacturer and a dealer to terminate another dealer who happens to have charged lower prices can be alleged to have been directed against the terminated dealer's "price cutting." In the vast majority of cases, it will be extremely difficult for the manufacturer to convince a jury that its motivation was to ensure adequate services, since price cutting and some measure of service cutting usually go hand in hand. Accordingly, . . . a manufacturer that agrees with one dealer to terminate another for failure to provide contractually obligated services, exposes itself to the